# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

RANDALL WILTZ

18 CV 0123

_____

Write the full name of each plaintiff.

_____CV_____
(Include case number if one has been assigned)

-against-

NEW YORK UNIVERSITY, FRANKLIN DIAZ,
ERIN LYNCH,

COLLINS BUILDING SERVICES, LLC,
ANGEL PERLAZA,
CUSHMAN & WAKEFIELD, INC., MICHAEL BRODERICK,
CITY OF NEW YORK,
STATE OF NEW YORK.

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

## COMPLAINT

Do you want a jury trial?
☑ Yes   ☐ No

---

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

## I.  BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☑  **Federal Question**

☐  **Diversity of Citizenship**

### A.  If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?
Pgs. 11-13: 42 USC Sections1983, 1985, 1986; 18 USC Sections 241, 242; 5th and 14th

Amendments; Americans with Diabilities Act. Pgs. 1 & 8: Fair Housing Act;

Rehabilitation Act. Pgs. 17-25: Racketerring Influenced and Corrupt Organizations Act.

### B.  If you checked Diversity of Citizenship

#### 1.  Citizenship of the parties

Of what State is each party a citizen?

The plaintiff ,  Randall Wiltz                                    , is a citizen of the State of
                (Plaintiff's name)

New York

(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

                                                                                    .

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

If the defendant is an individual:

The defendant, _____, is a citizen of the State of
(Defendant's name)

_____

or, if not lawfully admitted for permanent residence in the United States, a citizen or
subject of the foreign state of

_____

If the defendant is a corporation:

The defendant, _____, is incorporated under the laws of

the State of _____

and has its principal place of business in the State of _____

or is incorporated under the laws of (foreign state) _____

and has its principal place of business in _____

If more than one defendant is named in the complaint, attach additional pages providing
information for each additional defendant.

## II. PARTIES

### A. Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional
pages if needed.

| Randall | | Wiltz |
|---|---|---|
| First Name | Middle Initial | Last Name |

| 1 Washington Square Village, Apt. 14S | | |
|---|---|---|
| Street Address | | |

| New York | New York | 10012 |
|---|---|---|
| County, City | State | Zip Code |

| | |
|---|---|
| Telephone Number | Email Address (if available) |

## B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

New York University
_____
First Name                        Last Name

_____
Current Job Title (or other identifying information)
70 Washington Square South
_____
Current Work Address (or other address where defendant may be served)
New York                       New York            10012
_____
County, City                      State              Zip Code

Defendant 2:

Franklin                       Diaz
_____
First Name                        Last Name

_____
Current Job Title (or other identifying information)
8624 101st Avenue
_____
Current Work Address (or other address where defendant may be served)
Ozone Park                     New York            11416
_____
County, City                      State              Zip Code

Defendant 3:

Erin                           Lynch
_____
First Name                        Last Name

_____
Current Job Title (or other identifying information)
2 Washington Square Village
_____
Current Work Address (or other address where defendant may be served)
New York                       New York            10012
_____
County, City                      State              Zip Code

Defendant 4:    Collins Building Services, LLC
                24-01 44th Rd.
                Long Island City, NY 11101

Defendant 5:    Angel Perlaza
                2 Washington Square Village
                New York, NY 10012

Defendant 6:    Cushman & Wakefield, Inc.
                1290 Avenue of the Americas
                New York, NY 10104

Defendant 7:    Michael Broderick
                2 Washington Square Village
                New York, NY 10012

Defendant 8:    City of New York
                Corporation Counsel
                100 Church St
                New York, NY 10007

Defendant 9:    State of New York
                120 Broadway
                New York, NY 10271

Defendant 4: _____

First Name                          Last Name

_____

Current Job Title (or other identifying information)

_____

Current Work Address (or other address where defendant may be served)

_____

County, City                        State            Zip Code

## III. STATEMENT OF CLAIM

Place(s) of occurrence: 1 Washington Sq. Village, Apt. 14S, NY, NY 10012; 111 Centre Street, NY, NY 10013

Date(s) of occurrence: January 2016 & ongoing

## FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

- see attached -

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**INJURIES:**

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

Emotional Distress (pg. 16), physical injuries (chronic back pain; tinnitus, pg. 8),

constructive eviction (pg. 6) ; deprivation of rights to home (pg. 10); Expenses and lost

income (pg.14).

**IV. RELIEF**

State briefly what money damages or other relief you want the court to order.

See Attach, page 26

## V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| 1/5/18 | Randall Wiltz |
|---|---|
| Dated | Plaintiff's Signature |

| Randall | | Wiltz |
|---|---|---|
| First Name | Middle Initial | Last Name |

1 Washington Square Village, Apt. 14S
Street Address

| New York | NY | 10012 |
|---|---|---|
| County, City | State | Zip Code |

646-246-8180
Telephone Number

Email Address (if available)

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:
☑ Yes   ☐ No

    If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

Page 7

## CASE BACKGROUND[1]

## CASE BACKGROUND

1. This is an action by the Plaintiff to enforce the Civil Rights Act, ADA, Fair Housing Act, and RICO and obtain redress for years of harassment extending from 2012 to 2018, the denial, prevention, and interference with the Plaintiff's multiple requests for "reasonable accommodations", and observance of substantive and procedural due process rights hindered by a pattern of conspiratorial, unlawful acts of a landlord and partners over a number of years to evict rent stabilized tenants, including Plaintiff.

2. After informing the landlord of his race and disability in December 2015 and January 2017 requests to renew a lease to his rent stabilized home, the landlord's housing committee approved eviction action to serve the Plaintiff with papers in person and through the U.S. mail in accordance with its policy to deprive rent stabilized tenants of property rights.  As discussed below, the Defendant-Landlord receives significant government resources.

3. The Plaintiff brings this case against New York University, Franklin Diaz, Erin Lynch, Collins Building Services, LLC, Angel Perlaza, Cushman Wakefield, Inc., and Michael Broderick (collectively, "Defendants") and the New York City Civil Court/Housing of the County of New York for the State and City of New York ("housing court") alleges:

## FACTUAL BACKGROUND & ALLEGATIONS

4. In or around 1993, Plaintiff moved to New York to attend New York University the lead defendant in this case, ("NYU" or Defendant-Landlord") for his LLM in taxation and Master's in real estate development.

---

[1] This document was prepared with the assistance of New York Legal Assistance Group Legal Clinic for Pro Se Litigants in the SDNY.

5. That same year, the Plaintiff met Martha Dewell ("Martha"), who lived on one floor above the Plaintiff.  Martha became his surrogate mother and the Plaintiff lived with Martha until she passed away in April 2015, two months after the Plaintiff's lost his New Orleans birth mother to about a ten-year fight with cancer.

6. Martha was the tenant of record for the subject property of Apartment 14S (the "Apartment") located in Building 1 of the residential complex of Washington Square Village ("WSQV"), New York, NY 10012, owned and operated by NYU in the heart of Greenwich Village.  The Apartment is a rent stabilized unit in WSQV's complex of 1,200 units mixed with NYU affiliates and rent stabilized tenants under regulation of The Department of Housing & Community Renewal ("DHCR").  Since WSQV's acquisition in 1964, NYU has brought more than 500 actions against rent stabilized tenants in the New York City Civil/Housing Court for the County of New York ("housing court").  Rent stabilized units have been reduced to about 10% (ten percent) of the residences.  Another 10% (ten percent) remains unoccupied.

7. Upon information and belief, Defendant-Landlord NYU is "registered" as a private, educational, not-for-profit corporation existing under the laws of New York.  However, upon further information and belief, NYU has activities outside of the strict guidelines of its charter which can, in some cases, classify it as a "state actor" for purposes of civil actions.  First, the Defendant-Landlord derives a significant amount of unrelated business income from real estate operations. Second NYU has substantial governmental relationships and interactions.  NYU has received billions of dollars in the form of federal grants, reimbursements for medical and mental health services, tax breaks, and construction financing.  Community Board 2, New York City residents' voice for the

district in which NYU is located, is a tenant of NYU (3 Washington Square Village, #1A, NYC 10012).

8.  In NYU's 2008 tax year, about $822,915 was spent on government lobbying activities. Also, the Dormitory Authority for the State of New York announced in June 2016 that its $829 Million offering for NYU was largest in history for its private clients.

9.  After a very public battle with Greenwich Village organizations and residents over the $6 Billion "2031 Plan" announced in April of 2010 (plan development began around 2002)) and approved by its Board of Trustees consisting of New York City's top real estate developers, NYU won approval around July 25, 2012.

10. Upon information and belief, NYU exchanges property rights with the New York City to advance goals of the 2031 Plan.  For example, NYU's September 2, 2015 Land Disposition Agreement And City Indebtedness contract allows NYU to develop certain city properties.

11. In or around July 1995, the Plaintiff moved in with Martha with NYU's knowledge. Plaintiff lived with her openly and notoriously until her passing in April 2015, approximately twenty years.

12. Rent and other expenses for the Apartment were paid by a joint account opened by both Martha and her daughter, Laila Nabulsi ("Laila").  Plaintiff deposited money into the account regularly for rent and expenses.

13. The rent was paid from the account until approximately December 2015 when Laila closed the account.

14. In or around June 2015, Plaintiff was diagnosed with Major Depressive, Anxiety, and other disorders.

15. In or around August 2015, Erin Lynch ("Lynch"), NYU's Director of Facilities for the WSQV, ordered an investigation on Martha.  Upon information and belief, a similar report was conducted on Plaintiff and Laila as well.  All were done to coordinate a line of attached to defraud the Plaintiff out of his property rights.

16. On or about December 15, 2015, Plaintiff sent a letter to President John Sexton of NYU reminding him that he was accepted into the NYU Law Program as an African American, informing him of Plaintiff's disability, and requesting succession rights to the Apartment. Plaintiff never received a response to this letter.

17. On or about December 16, 2015, Plaintiff sent another letter to Mr. Michael Broderick ("Broderick") of Cushman & Wakefield, Inc. ("Cushman"), the leasing agent for WSQV, detailing his request for a renewal lease / succession rights and including a check for January 2016's rent payment.  Before any response, the Plaintiff sent another letter and February 2016's rent payment to Defendant Broderick on January 27, 2016.  Defendant Broderick intentionally and unlawfully ignored taking required action on that request upon the instructions of Defendant-Landlord. Defendant Broderick coordinated with Defendant-Landlord and Defendant-Landlord's counsel to wait until after ten-day notice was severed on the Plaintiff to respond with a mailed February 2, 2016 letter rejecting Plaintiff's rent payments because the case was in litigation.

18. In addition, the Plaintiff called, emailed, and sent letters to board members to follow up on the request to address and send information to the housing committee.  Again, the Plaintiff was not given access.

19. Upon information and belief, Defendant Broderick was also instructed through wire communications to unlawfully ignore Plaintiff's requests for rent payment receipts, e.g.,

4

April 20, 2017 letter from Plaintiff to Defendant Broderick, and "reasonable accommodations" for noise complaints, March 23, 2017 letter from the Plaintiff to Defendant Broderick.

20. Upon information and belief, Defendant-Landlord and its board gave specific instructions to force out the Plaintiff from his home. Those instructions were interpreted as standing orders to undermine Plaintiff's tenant and constitutional rights.

21. Upon information and belief, Plaintiff's files, records, and confidential information establishing Plaintiff's residency in the Apartment were gathered, prepared, and mailed/emailed to Defendant-Landlord's counsel Joseph Burden of Belkin Burden Wenig & Goldman, LLP ("Defendant-Landlord's counsel") in 2015 to execute an eviction strategy before any communication with the Plaintiff.

22. On or about December 18, 2015, Laila received a letter from Mr. Burden regarding succession rights for the Apartment. Seemingly in response to Plaintiff's December 15th letter, NYU offered to allow Plaintiff to remain in occupancy until June 30, 2016 in exchange for Nabulsi and Plaintiff waiving any and all rights to the Apartment. No information was ever sent to the Plaintiff. Laila informed NYU that she would inform the Plaintiff. The Plaintiff sent another request to Mr. Burden this time regarding request to address his home situation. The Plaintiff even offered to compromise by moving to another apartment. Again, no response.

23. Upon information and belief, Defendant NYU had policies and procedures in place for processing lease renewal requests from rent stabilized tenants.

24. Plaintiff never received any letters or instructions from NYU or any third party for application procedures to apply for succession rights following his requests for such.

25. In or around December 2015, the Plaintiff notified NYU that the Apartment began to fall into disrepair due to an ongoing roof repair.

26. The Defendants NYU, Franklin Diaz ("Diaz"), Lynch, Collins Building Services, LLC ("CBS"), Angel Perlaza ("Perlaza"), Cushman & Wakefield, Inc. ("Cushman"), and Michael Broderick ("Broderick"), and Defendant NYU's counsel made conscious decisions not to reply to repair requests.  To date these issues have not been addressed and the Apartment in a defective and dangerous conditions.

27. Upon information and belief, Defendant Lynch was and is an employee of Defendant NYU, the facilities director of NYU Housing, reporting to Defendant NYU's president's office, and an active participant in NYU's unlawful scheme to evict rent stabilized tenants (including Plaintiff).

28. Upon information and belief, Defendant Diaz was an employee of Defendant NYU, listed as the property manager on housing authority public reporting forms, reported to Lynch, and was and is an active participant in NYU's unlawful scheme to evict rent stabilized tenants (including Plaintiff).

29. Upon information and belief, Defendant Perlaza was and is an employee of Defendant CBS, reports to Defendant NYU, manages maintenance calls through building superintendents (Mr. Santana for Plaintiff's Apartment Building) and other personnel, and was and is an active participant in NYU's unlawful scheme to evict rent stabilized tenants (including Plaintiff).

30. Upon information and belief, Defendant Broderick was and is an employee of Defendant Cushman & Wakefield, reports directly to Defendant NYU, and was and is an active participant in NYU's unlawful scheme to evict Plaintiff.

31. In or around January 2016, Plaintiff received from NYU a Notice of Petition and Petition for a hearing to evict Plaintiff from the Apartment.

32. Upon information and belief, Defendant-Landlord NYU organized and promoted a plan to harass and evict their rent stabilized tenants, including the Plaintiff.  The plan was dubbed the conversion plan, but it is more correctly characterized as the eviction plan ("Eviction Plan") because one of the main purposes was to evict the rent stabilized tenants.

33. Between January 2016 and March 2016 Plaintiff continued paying rent, however NYU returned his payment each time.

34. At the first hearing, on or about March 9, 2016, the housing court elected to stay the eviction until the conclusion of the case and approved NYU's request to receive rent. Also, the Plaintiff asked the housing court for help with representations based on medical conditions.  The housing court said that it did not help with representation.

35. On or about April 19, 2016, Plaintiff submitted his objections to defendant's discovery order served without the housing court's permission.  Therein, Plaintiff informed the court again of his disability and that Plaintiff would need assistance with representation.

36. On or about May 17, 2016, the housing court ordered a discovery schedule, requiring that Plaintiff present proof of residence, expenses, payments, etc. for both Plaintiff and Martha for the past two years (by a later order, discovery was to conclude on November 30, 2016).  In the May Order, the housing court noted that it would consider a protective order with respect to the parameters of the deposition, affirming that the housing court was now aware of Plaintiff's disability.

37. In or around June 13, 2016, water leakage in Plaintiff's Apartment resulting from the same ongoing roof construction, which originally caused the Apartment to begin falling into disrepair in December 2015, caused water damage and water accumulation in the Apartment. As a result of the accumulation, Plaintiff slipped and fell. The fall caused a back, head, and wrist injuries for which Plaintiff was treated at Lenox Hill Hospital. To date Plaintiff has a chronic back pain and tinnitus as a result of the fall.

38. Defendant-Landlord's security personnel prepared an accident report but no action was taken. At the same time, Defendant-Landlord kept demanding rent from the Plaintiff.

39. Prior to the accident or shortly after, the Defendants NYU, Lynch, Diaz, CBS, Perlaza, Cushman, and Broderick, individually or collectively, neglected and omitted to restore legally mandatory, essential services to make Plaintiff's residence safe and allow him to enjoy his home as the same as other tenants not being sued or without disabilities.

40. Between January of 2016 and September 2016, Defendants Lynch, Diaz, Perlaza, Broderick, and workers used wire communications discussing not fulfilling obligations to perform mandatory repairs. After the Department of Housing Preservation & Development's ("DHPD") investigations began, Defendants Perlaza, Lynch and Diaz attempted to show cooperation by offering to repair the floors. Defendant Landlord's building superintendent did an evaluation and ordered repairs. However, DHPD informed the Plaintiff that asbestos testing should be done to prevent dangers from disturbed asbestos. Defendants Perlaza, Lynch, and Diaz knew or should have know this because this was a problem with other units for which precautions were necessary. Also, Defendant-Landlord's facilities manager, Gerard Savoy, was in the loop and on the emails regarding Plaintiff's repairs.

8

41. The Plaintiff became in fear of any further attempted acts of cooperation as this further demonstrated the Defendant-Landlord's reckless disregard for the Plaintiff's health and safety, value as an African-American tenant, and disability. The Plaintiff truly felt the need for representation to guard against the Defendant-Landlord's animus, discrimination, and harassment.

42. At a hearing, in or about June 23, 2016, the Plaintiff informed the housing court that Plaintiff was continuing to seek legal assistance to represent him before the housing court. The housing court responded by requesting that Plaintiff keep it abreast of any developments during this process. The Plaintiff had given the housing court a consideration letter from Housing Conservation Coordinators regarding legal representation, which was later denied.

43. In accordance with the Legal Aid Society's instruction to obtain their representation and also the housing court's directive, the Plaintiff informed the housing court in or about July 20, 2016 of his unsuccessful attempts to receive assistance from third parties and again requested assistance with representation, specifically requesting the housing court to refer Plaintiff to NYC's Housing Resources Administration ("HRA"). The housing court did not respond to this letter, nor took any action upon it.

44. Moreover, Plaintiff received no disability assistance during the process of litigating his claim from the court beyond the housing court's suggesting and denying a protective order with respect to the parameters of his deposition.

45. On or about October 4, 2016, the Plaintiff had applied for the protective order with respect to the parameters of the deposition, limiting it to forty-five (45) minutes.

46. On or about October 31, 2016, the housing court issued a Conditional Order requiring the Plaintiff to comply with the discovery deadlines or my answer will be stricken and Plaintiff will be sent to inquest. Specifically, Plaintiff was to be deposed by NYU on or before November 30, 2016. On the same day, the housing court issued another Order denying Plaintiff's request for a protective order.

47. Plaintiff was working to comply with discovery but fell ill in with an unidentified viral infection at the beginning of November 2016. Plaintiff's illness grew increasingly worse, presenting as a life-threatening illness, including hyperthermic fever of unknown origin.

48. Email and mail notifications of Plaintiff's medical illness were sent to the Defendant-Landlord on and after November 15, 2016 by the Plaintiff's representative. But, Plaintiff still offered to complete discovery when possible.

49. Instead of communicating with Plaintiff's legal representative at that time, NYU conducted ex parte communications with the housing court's attorney about filing a motion to strike Plaintiff's answer, which was actually filed on December 8, 2016. Ultimately, in March 2017, Plaintiff's answer was stricken from the record and a decision was rendered in NYU's favor even after the Plaintiff offered and showed information regarding medical information and evidence of the Defendant-Landlord counsel's bad faith.

50. The housing court scheduled the Plaintiff for an inquest on April 25, 2017, at which time the housing court scheduled the Plaintiff for a June 9, 2017 eviction after the Defendant-Landlord's counsel conducted ex parte communications with housing court personnel again. Defendant-Landlord entered that April 25, 2017 order was entered into the

housing court's records shortly after and a copy was mailed to the Plaintiff in furtherance of the Eviction Plan.

51. Although the housing court granted the Plaintiff a May 9, 2017 hearing to address Plaintiff's reasonable medical excuses for any discovery delays, the housing court later denied that hearing with influence of Defendant-Landlord counsel's emailed letter urging the housing court to deny Plaintiff's constitutional rights his hearing.

52. Upon information and belief, the motion to strike, and other actions, were taken in accordance with the Eviction Plan and in retaliation for the Plaintiff's Decreased Services Complaint filed with The Division of Housing and Community Renewal (DHCR), which received and/or sent the mail of Defendant-Landlord counsel's November 1, 2016 report falsely stating that the Plaintiff was not a "rent regulated tenant" to defraud the Plaintiff out of DHCR protections.  This same kind of fraudulent information (labeling the Plaintiff, while paying rent, as an "unlawful tenant") was emailed to the Plaintiff on March 23, 2017.

53. On or about April 25, 2017, the Plaintiff presented an Order to Show Cause to Renew and Reargue the incorrect ruling striking his answer as he had presented a reasonable medical excuse and a meritorious defense.  Plaintiff's Order to Show cause was granted and he was given a return date of May 9th to argue the Motion to Renew and Reargue.  However, the requested stay of proceedings was denied.

54. After frustration with the housing court's consistent denial of ADA rights and the April 25th hearing, Plaintiff sought additional help through The Uniform Court System's administration.  After informing the administration about the constitutional violations, the Plaintiff was informed that ADA representatives / liaisons did exist in the courthouse.

This was the first time Plaintiff was informed of their presence after a year in litigation much to his surprise as had never seen any information at the housing court or given any instructions by the housing court to seek help.

55.  In or around the end of April 2017, The Uniform Court System put the Plaintiff in contact with the housing court's Americans with Disabilities representative regarding the Order striking his answer because the Plaintiff believed the court struck his answer in violation of his rights as a disabled individual.

56. On or about May 3, 2017, Plaintiff called Mr. William Smith of the ADA representatives' office.  Through the course of Plaintiff's contact with Mr. Smith over the following few days, it became apparent that Mr. Smith would not be able to provide the assistance Plaintiff was asking for.  Specifically, Plaintiff asked what procedures were in place for disabled individuals to submit confidential and private mental health records and was informed that ADA representatives could not help with the legal aspects of a court case.

57. After an unsuccessful attempt to receive help via phone and email, Plaintiff elected to go down to the courthouse to see if other avenues could be opened.  When Plaintiff spoke to the Housing Court Clerk that day, the Clerk gave him Judge Fisher's—the administrative judge for administering ADA procedures—email address.

58. On May 9, 2017, the Plaintiff arrived at the courthouse for the hearing pursuant to the April 25th order.  However, the Judge overseeing Plaintiff's proceeding was not in the courthouse.  The sitting Judge informed the Plaintiff that there was a delay in reviewing the files.

59. On or about May 12, 2017, Plaintiff sent an email to Judge Fisher requesting assistance regarding his ADA rights.

60. On or about May 30, 2017, Plaintiff was contacted by Eddy Valdez, an ADA representative within the courthouse pursuant to his email to Judge Fisher. This was the first time Plaintiff was able to get in touch with a high-level ADA representative in the housing court. Unfortunately, the email did not end up in the correct inbox, presumably because the response was not sent from the email address Plaintiff originally requested assistance from.

61. None of the Defendants or housing court personnel having appropriate power took action to stop the harm caused by the denial of Plaintiffs constitutional rights.

62. Prior to the Defendant-Landlord's motion to strike, in or around August 2016, Plaintiff filed complaints with the Department of Housing Preservation and Development ("DHPD") that resulted in multiple violations, as the Landlord's denial of tenant services was creating safety issues in the Apartment.

63. On or about October 10, 2016, Plaintiff filed a complaint with the Department of Housing and Community Renewal ("DHCR").

64. On or about November 25, 2016, DHCR performed that site evaluation that gave rise to a DHCR Violations Order.

65. In or around December 2017, Defendant-Landlord NYU, presumably in response to Plaintiff's DHCR and DHPD complaints, filed a DHCR complaint against Plaintiff out of retaliation.

66. In or around May 2017, Plaintiff learned that this complaint and other acts such as injecting false information into the Housing Court proceedings were part of a coordinated harassment and discrimination, targeting the Plaintiff for asserting succession rights and

making safety complaints.  As a result, Plaintiff reported this to the New York State
Division of Human Rights ("DHR").

67. Subsequent to Plaintiff reporting these issues to DHR and DHCR in May and June of
2017, respectively, the Defendant-Landlord NYU summarily fired some of the
purportedly responsible personnel such as Defendant Diaz who is a witness to an
investigation and possible target for retaliation.

68. In June and July of 2017, the Plaintiff was then informed that the papers for his litigation
were lost by the housing court, resulting in the delay.

69. On or about July 24, 2017, Plaintiff sent a letter to the housing court requesting the
promised hearing, providing medical information demonstrating justification for
reasonable accommodations, showing that the Defendant Landlord had acted in bad faith,
and requesting that his constitutional rights be observed.

70. Around the end of July 2017, the Defendant-Landlord sent and emailed a letter
intentionally interfering with the Plaintiff's request to have his constitutional rights
respected.

71. On or about July 24, 2017, the Defendant-Landlord's counsel sent an intentionally false
statement to DHCR representing that Defendant Diaz was still an employee of the
Defendant-Landlord even though Defendant Diaz had been fired partly because of
Plaintiff's DHR complaint.  Defendant Diaz was fired by Defendants such as Defendants
Lynch and Perlaza in consultation with Defendant-Landlord's counsel.  Defending these
types of baseless claims cost the Plaintiff lost time and expenses of travel, printing, legal,
etc.

72. Moreover, that same mailed DHR response reflected the personal animus toward the Plaintiff. The Defendant-Landlord and it counsel used "code language" suggesting that Plaintiff is an angry black man.  This supports the information and belief that Plaintiff's racial status and disability was the target of communications regarding Plaintiff's requests for "reasonable accommodations" and a lease renewal after elected officials supporting the Plaintiff sent letters to Defendant-Landlord.  For example, such letters were sent to the Defendant-Landlord Board's Chairman and President on December 18, 2015 and February 18, 2016, respectively.

73. Also, the Defendant-Landlord has a policy of placing African Americans on the lower floors of its residential buildings.  Whites have preferences for the higher floors.  The Defendant-Landlord refused to provide DHR with its racial statistics in connection with the Plaintiffs May 2017 discrimination complaint.

74. Last, in that same mailed DHR response, Defendant-Landlord's counsel submitted personal financial lease documents obtained in contempt of the housing court's August 29, 2016 discovery order allowing the Defendant-Landlord's counsel to subpoena documents from Pan Am Equities only.  Defendant-Landlord's counsel retrieved documents form other companies in an attempt to undermine court proceedings for purposes of evicting the Plaintiff.  Upon information and belief these documents were obtained by efforts of Defendant-Landlord's counsel, Defendant Lynch, and Defendant Perlaza.

75. On or about August 17, 2017, Plaintiff received a decision affirming the March 29, 2016 decision.  Plaintiff was never given the requested and granted hearing to argue his Motion to Renew and Reargue.

76. In early September 2017, a warrant for eviction was scheduled for September 8th.

77. At the time, Plaintiff was working with APS and managed to delay the eviction date until approximately October 4, 2017.

78. On or about September 22, 2017, the Plaintiff went for a meeting at Bellevue pursuant to his condition.  Plaintiff was held at Bellevue by treating doctors (including doctors of Defendant-Landlord's) involuntarily until October 6, 2017.  After receiving request for "reasonable accommodations" from Bellevue Doctors (including NYU Doctors on staff), the Defendant-Landlord attempted to carry out an eviction order on or about October 4, 2017.  Defendant-Landlord's counsel mailed and or emailed a September 28, 2017 to the New York City Department of Investigation, Marshal's Bureau, a letter requesting eviction action and falsely stating that the Defendant-Landlord did not communicate telephonically to The New York State Division of Human Rights that it was looking into alternative housing because it wanted to take Plaintiff's Apartment.  Upon information and belief, these false statements were made to expedite Plaintiff's eviction.

79. Plaintiff was forced to submit an Order to Show Cause to the housing court on October 2nd detailing his disability.  The housing court's Administrative Judge signed the Order and granting a hearing for October 12th.

80. During the October 12th hearing, the housing court reinstated the eviction order and required that APS be notified of developments prior to any eviction.  The next eviction date, as set by the court, was scheduled for November 14, 2017.

81. On or about November 3, 2017, during the DHCR Conference Hearing, NYU did not refute any of the allegations of intentional harassment directed toward the Plaintiff for purposes of unlawfully forcing Plaintiff out of the Apartment.  These types of actions

have caused the Plaintiff to emotional distress.  However, DHCR's ruling is on hold

pending the resolution of the housing matter; DHCR's enforcement authority will be lost

if Plaintiff is evicted from his rent stabilized Apartment.

82. On or about November 13, 2017 Plaintiff filed an appeal and was granted a temporary

stay pending an initial hearing.

83. On or about December 6, 2017, Plaintiff's request for a stay of eviction pending appeal

was denied.

84. Plaintiff has received a new Marshall's Notice dated December 27, 2017.

85. Neither the housing court nor its appellate division has ever reached a conclusion on the

merits of the case.  Rather, judgment was rendered for NYU solely by reason of

Plaintiff's answer being stricken from the record.

86. The Plaintiff has meritorious defenses against the Defendant-Landlord's holdover

petition, including a succession rights to Martha's lease as he meets the one and two-year

co-residency, emotional bond, and financial interdependence requirements, lease renewal

rights under laches as he is the primary rent paying tenant with a twenty-year residency,

and lease renewal rights under the tenant retaliation and harassment, and tenants

association interference statutes.

87. The Plaintiff reserves the right to amend this complaint if necessary to add additional

claims, parties, facts, or circumstances.

## RICO FACTS

88. All of the above Paragraphs (1-86) are incorporated as if more fully stated herein.

89. Upon information and belief, the organizations of Defendants NYU, CBS, and Cushman,

and the Defendants Lynch, Diaz, Perlaza, and Broderick, and Alison Leary, Defendant

17

Lynch's predecessor, and Cooper Square Management and Grubb & Ellis Management

Services Inc. (the previous management companies), and Belkin Burden Weng &

Goldman, LLP constitutes an enterprise (the "NYU Enterprise") and acted together with

the common objective of evicting rent stabilized tenants and others (including the

Plaintiff) by knowingly and intentionally engaging in a systematic pattern of unlawful

felonious acts over a period of years to support that purpose for self-interests and benefits

at the expense of persons and property.

90. Defendant NYU is a person as defined under 18 USC §1961(3).

91. Upon information and belief, the NYU Enterprise is an association-in-fact within the

meaning of 18 USC §1961.

92. For all relevant times, the NYU Enterprise has operated for the purpose of investing in,

owning, managing, and operating educational programs and real estate operations.  It

derives its income from tuition, room and board, endowment, grants from private

foundations and government, gifts from friends, alumni, corporations and other private

philanthropic sources, and revenue from patient care through faculty group practices—

including significant portions from Medicare and Medicaid—and real estate operations.

93. For all relevant times, the NYU Enterprise affected interstate commerce in that it used the

U.S. mail and wire infrastructure to conduct its business and generated annual revenues

in excess of one million ($1,000,000.00).

94. Through Defendant-Landlord NYU, Defendants Lynch, Diaz, Cushman, Broderick, CBS,

and Perlaza coordinated eviction tactics designed to intentionally remove all rent

stabilized and unwanted tenants from NYU's apartments with disregard for the

established rights of those tenants, including Plaintiff, ("Eviction Plan").

95. This was part of a larger plan by NYU to maximize profit potential, adopted in or around 2002 (the "2031 Plan").

96. Upon information and belief, Defendant Lynch, with no direct significant experience in housing management, was hired by NYU as the face of the Eviction Plan because of her commitment to NYU's president and to carry out NYU's wishes to clear out all rent stabilized and unwanted tenants. Defendant Lynch submitted false information to have the Plaintiff evicted and conducted inappropriate investigations as part of the Eviction Plan. In consultation with Defendant Landlord's counsel, Defendant Lynch mailed a false affidavit, sworn on April 13, 2016 and mailed on the same to the Plaintiff, stating that is was unknow that the Plaintiff was a resident in the Apartment prior to April 2015 or that Plaintiff was a twenty-year resident. This was done to undermine the longevity of Plaintiff's relationship with Maratha, an important element for claiming succession.

97. Defendant Lynch also operated to reduce the powers of the rent stabilized tenants. For example, Defendant Lynch, participated in establishing a separate tenants' association for NYU affiliates to reduce the power of the tenants' association in which rent stabilized tenants use to protect their rights against Defendant-Landlord infringement. Such interference was intended to defang the tenants' association and diminish rent stabilized tenants' willingness to freely participate in the tenants' association. Thus, the Plaintiff was not able to get much support in his challenges to Defendant-Landlord harassment. His rights to freely associate with fellow rent stabilized tenants for support were diminished.

98. Upon information and belief, Defendant Diaz was hired by NYU due to his reputation of being aggressive with tenants. Defendant Diaz aggressively sought tenants for eviction

19

in his paid role as property manager. Upon information and belief, Diaz hired the roofing company, in which he had a relative working, from which he received illegal payments, and participated in leaving the roof open to the elements, causing Plaintiff's Apartment's poor condition and resulting in Plaintiff's bodily injury.

99. Upon information and belief, Defendant Cushman was hired somewhere around 2005 as the leasing and maintenance company. Defendant Cushman role was to help facilitate evictions as previous management companies hired by Defendant NYU were not executing its wishes. However, because the directives of the Eviction Plan were not being strictly observed, the maintenance responsibilities were later taken away. Defendant Broderick was the lead representative for Defendant Cushman.

100. With reduced responsibilities, Defendant Cushman still participated in NYU's Eviction Plan by executing its directives. For example, Defendant Cushman agreed to withhold lease renewals at the request of Defendant NYU without substantiating justifications under the Rent Stabilizations Code. Defendant Broderick was given the opportunity by Defendants NYU, Cushman, and CBS to gain management incentives and have access to conduct activities for private gain.

101. Upon information and belief, Defendant CBS became the managing company for WSQV and other Defendant-Landlord's properties somewhere around 2010 and was given increased responsibility in comparison to prior management companies NYU had employed. Defendant CBS took over the management/maintenance responsibilities from Defendant Cushman. Defendant Perlaza was the lead representative for CBS, presumably due, in part, to his aggressive management style for executing the objectives of NYU.

102.     Defendant CBS is listed on Defendant-Landlord's tax returns as one of the highest compensated contractors.  For example, Defendant CBS is reported as having received $55,810,778 on Form 990 for the tax year ending August 31, 2014.  Upon information and belief, Defendant CBS has a unique and undisclosed relationship with members of Defendant-Landlord's organization.

103.     Defendant CBS specialized in school building management services and employed tactics to evict tenants, reduce maintenance costs, and de-unionize the workforce.  Defendant Perlaza was given opportunity by Defendants NYU and CBS to gain management incentives and have access to run operations for private gain, such as hiring friends and family (e.g., Felipe Perlaza, Director of Engineering) in exchange for side payments.

104.     Moreover, defendant CBS earned more than fifty million dollars from NYU for management services they provided to NYU between the Summer of 2015 through the Summer of 2016.

105.     In addition, NYU hired the law firm of Belkin Burden Wenig & Goldman, a firm with decades of experience suing thousands of tenants for high-profile clients, including President Donald J. Trump.  Moreover, the firm has a reputation for aggressive tactics; their second named partner was found guilty of fraud discovery tactics on February 17, 2004 similar to those used in this case to evict Plaintiff.  See, Supreme Court, Appellate Division, First Department, New York, *IN RE: Joseph BURDEN, an attorney and counselor-at-law. Departmental Disciplinary Committee for the First Judicial Department, Petitioner, v. Joseph Burden, Esq., Respondent,* February 17, 2004.

106.    Upon information and belief, through a series of plans and discussions, Defendants agreed to and executed an eviction plan to remove all rent stabilized and otherwise unwanted tenants from NYU-rented housing, pursuant to the 2031 Plan (the "Eviction Plan").

107.    Defendants had an interest in coordinating the Eviction Plan.  NYU sought partner cooperation to free its buildings from both government and union control, while its partners sought opportunities with NYU to expand market services and achieve financial gain.

108.    Pursuant to the Eviction Plan, Plaintiff was denied essential services and deprived of a safe, healthy, and habitable dwelling.

109.    Upon information and belief, Defendants were in agreement to evict Plaintiff as part of and in furtherance the Eviction Plan.  Upon further information and belief, NYU provided a series of beneficial concessions to the remaining Defendants to evict Plaintiff

110.    Throughout the eviction process, Defendants sent false information to the housing court, regulatory agencies, and Plaintiff using the U.S. mail and wire infrastructure.

111.    In or around June 2016, after Plaintiff's slip and fall, Defendants began to conceal evidence of the Eviction Plan by attempting to interfere with HPD access and investigations, firing key co-conspirators, manipulating reporting records to HPD and DHCR about Defendant Diaz's and Broderick's management positions.

112.    Defendant-Landlord NYU sought to benefit from the Eviction Plan by unlawfully acquiring the property rights of the Plaintiff.  The remaining Defendants sought to benefit from the Eviction Plan by maintaining employment and service agreements with NYU

22

through their participation in committing acts and acts of omission related to the Eviction Plan.

113.     Beginning as early as 2000, Defendants NYU and Lynch, and Alison Leary conducted the affairs of the enterprise through a pattern of racketeering activity. This included the predicate acts of mail fraud in violation of 18 U.S.C. § 1341 and/or wire fraud in violation of 18 U.S.C. § 1343.

114.     In or around 2015 Alison Leary left NYU and Defendant Lynch took on additional responsibilities within NYU and in furtherance of the NYU Enterprise.

115.     On numerous occasions as stated above, Defendants used the U.S. mail and wire communications infrastructure to perpetrate their fraudulent scheme, acted within the knowledge that the use of this mail and wire communications infrastructure would follow in the ordinary course of business, and could reasonably foresee such use.

116.     Defendants' use of the U.S. mail and wire infrastructure included communications among Defendants NYU, CBS, Lynch, Diaz, Perlaza, and Broderick, and communications between Defendants and various tenant, regulatory agencies and officials, all in furtherance of Defendant's fraudulent scheme.

117.     Defendants' fraudulent scheme and pattern of racketeering activity is ongoing, and has been directed at other victims besides the Plaintiff, such as additional tenants in the Defendant-Landlord-controlled buildings that have been targeted by Defendants. Defendant-Landlord has brought over 500 actions against tenants in Defendant-Landlord's buildings. For example, upon information and belief, Defendants have used similar tactics of the Conspiracy on other tenants:

a.  WSQV, Building 1, Unit 3B – resident for many years but were repeatedly mailed and served Notices in 2017 and 2016 to Cure from Defendant Lynch and Defendant-Landlord's counsel after proof of legitimate tenancy was provided.

b.  WSQV, Building 1, Unit 16V – senior citizen was surveilled at the instruction of Defendant Lynch and Defendant-Landlord's counsel for medical absences in 2016 after medical issues were demonstrated.

c.  WSQV, Building 1, Unit 10H – evicted after being mailed and served holdover petition for eviction and threatened with damaging personal information.

d.  WSQV, Building 1, Unit 14R – evicted after being mailed and served a holdover petition dated August 8, 2016 by Defendant Lynch and Defendant-Landlord's counsel to terminate the month-to-month tenancy after being told the falsehood that she was protected without long-term lease.

e.  WSQV, Building 3, Unit 5I –mailed and served and holdover petition dated October 14, 2015 by Defendant Lynch's predecessor, Alison Leary, and Defendant-Landlord's counsel who is attempting reverse a lease renewal by falsely stating that tenants did not get sublet permission when in fact they did.

118.    In addition, Defendant-Landlord uses a tax evasion scheme to threaten its rent stabilized tenants and others with market-rate rent if they don't give up their rights.  In the holdover petitions dated February 19, 2016 and mailed to the Plaintiff and Laila Nabulsi at the Apartment, dated October 14, 2015 and mailed to Carolyn Sevos, Jean-Pierre Sevos, Cathrina Sevos, and Russell Hamilton of 3 WSQV, Apt #5I, NYC 10012, dated August 8, 2016 and mailed to Eharper Jeremijenko-Conley, Jamba Jeremijenko-Rae of 1 WSQV, Apt 14R, NYC 10012, and others targeted for eviction, the Defendant-Landlord, its counsel, and Defendant Lynch ask for market rate rent while Defendant-Landlord is under New York State and Federal tax obligations to not charge rates higher than rates charged to NYU faculty.  Otherwise, NYU faculty will be subject to income taxes, currently and retroactively, on the lodging subsidies reducing the market rate rent charged.

119.     Also, Defendant-Landlord manipulates regulatory filings to charge each of its students sharing a single unit the same rental rate as a family would pay for one unit. Last, over the years Senator Chuck Grassley questioned NYU's financial and real estate practices, particularly those involving expenditures on students and giving NYU affiliates below market rate rentals as perks. NYU had to respond to the Senator's March 15, 2013 letter questioning the use of NYU's tax-exempt status.

120.     These factors are forces behind the Eviction Plan. If it brings into question the appropriate treatment of the business and financial reporting records, restatements may be a required course.

121.     The Plaintiff will provide a complete RICO Statement with in 30 days of a request from the District Court.

122.     As a direct result of the fraudulent conduct perpetrated by Defendants, the Plaintiff has suffered and will continue to suffer damages, including harm caused by (1) unlawful eviction actions; (2) fraudulent proceedings in court and with housing authorities; (3) diminution of tenant and succession rights; (4) incurring lost wages for times spent defending fraudulent eviction claims; (5) incurring unnecessary transportation expenses defending fraudulent stories.

**RELIEF**

(a) Granting a mandatory injunction requiring The Defendant-Landlord to deliver a rent-stabilized renewal lease of the Apartment to Plaintiff in conformity with the Rent Stabilization Code;

(b) Providing injunctive relief in the form of instructing New York State and New York City require the New York City Civil/Housing Court of the County of New adopt and publicize the appropriate information for individuals needing and seeking help in compliance with the ADA.

(c) Granting a mandatory injunction requiring the Defendants to immediately cease & desist harassment of and discrimination against the Plaintiff.

(d) Granting a mandatory injunction requiring the Defendants to immediately institute procedures eliminating all policies and practices discriminating against residents who are minorities or have a disability.

(e) Awarding Plaintiff a reduction in the legal rent of the Apartment uninhabitable living conditions;

(f) Awarding Plaintiff compensatory damages for personal and bodily injury, to include intentionally-inflicted emotional distress, emotional and psychiatric injury in an amount to be ascertained at trial but not less than Five Million Dollars ($5,000,000.00);

(g) Awarding Plaintiff compensatory damages for Defendants' continual impairment of Plaintiff's right quietly to enjoy and possess the Apartment in an amount to be ascertained at trial, but not less than One Million Dollars ($1,000,000.00);

(h) Awarding Plaintiff punitive damages for the unlawful and outrageous conduct of the defendants in an amount to be ascertained at trial but not less than Five Million Dollars ($5,000,000.00);

(i) Awarding Plaintiff and treble damages for the unlawful and outrageous conduct of the defendants in an amount to be ascertained at trial but not less than Thirty-Three Million Dollars ($33,000,000.00);

(j) Granting such other, further or different relief as justice may require.